## P. E. WILLIAMS v. THE STATE.

*No. 751. Decided June 1.*

1. **Robbery by Means of Threats—Allegation and Proof—Variance.**— Where an indictment for robbery charged, under provisions of article 723, Penal Code, that the property was acquired by means of threats, and the proof showed, that in addition to the threats defendant proceeded to execute the same by assaulting the prosecutor with his gun, *Held*, that simply because the proof sustains not only the allegations charged in the indictment, but would also sustain another and greater offense, there is no variance.

2. **Same—Ownership—Partnership—Want of Consent.**—Where, on a trial for robbery, it was shown that the property taken was a check drawn by the assaulted party upon a partnership firm of which he was a member, and was drawn thus in order to enable the defendant to get the money from the partnership, the prosecutor having no separate funds in the institution, *Held*, that the robbery was not a taking from the firm, but from the prosecutor only; and that it was not necessary to allege ownership in nor to negative the want of consent of the other firm members to the taking.

3. **Same—Evidence—Lost Instrument—Variance.**—On a trial for the fraudulent taking of a check from the prosecutor by robbery, and parol proof was introduced of the loss and destruction of said original check, *Held*, that a copy of said check written upon a blank similar to the original was properly admitted in evidence, and the fact that this copy had some writing across the face not in the original, but which was explained by a witness, constituted no variance.

4. **Requested Instructions.**—It is not error to refuse requested instructions which have been substantially given in the charge of the court.

5. **Robbery—Check—Indictment—Value—Evidence.**—Where an indictment charges that the property acquired by a robbery was a check or draft, and set out the instrument by its tenor, and the instrument so set out is a subject of theft or robbery under the statute (Penal Code, article 732), *Held*, that it is not necessary that the indictment should allege that the said instrument had any specific value, nor was it error to admit proof that defendant cashed said check and procured money thereon.

6. **Defendant as a Witness—Impeachment of.**—On a trial for robbery, where the prosecutor had testified that the defendant had a pistol on his person at the time, and defendant, as a witness in his own behalf, denied that he had a pistol, or had ever owned or carried one in the State, *Held*, admissible to contradict him by proof showing that he had a pistol on the Monday following the robbery.

7. **Jury—Verdict—Practice on Appeal.**—On the trial of a criminal case, where two theories are presented by the evidence, both of which are fairly submitted to the jury in the charge, the verdict, if justified by the evidence, will be upheld.

APPEAL from the District Court of Denton. Tried below before Hon. J. T. BATTORFF, Special Judge.

This appeal is from a conviction for robbery, the punishment being assessed at five years' imprisonment in the penitentiary.

The essential facts will be shown by the testimony in chief of Henry Selz, first witness for the State, who testified as follows: "My name is Henry Selz. I live at Pilot Point, Denton County, Texas; have been living there for the past eighteen years. I am in the public gin business at that place. J. P. Cooper and Matt Williams are in partnership with me in that business, under the firm name of Cooper, Selz & Co., and were on the 27th of October, 1894. I have charge of the business of the firm, and had on October last; and I do the paying out and receiving money for the firm. I know the defendant, P. E. Williams; first became acquainted with him on the 27th day of October, 1894. And I know Mrs. W. J. Stewart; first became acquainted with her at my house about the 10th of last October. My wife, who was about that time at Mrs. Rose's, nursing a sick child, employed Mrs. Stewart to come to our house and do general household work; and after my wife employed her, Mrs. Stewart began work about the 10th of October. Mrs. Stewart worked at my house something like two weeks, and left on Thursday. I was not at the house when she left. On Sunday morning, before Mrs. Stewart left my house on the following Thursday, she demanded $500 of me, claiming that I had insulted her on the night previous, which was Saturday night. On that Saturday night I went up town to the barber shop before 9 o'clock, and Ad Alexander, a witness in the case, came back home with me. We got back between 9 and 10 o'clock; went together in the dining room of my house; talked

in there with each other awhile, about ten or fifteen minutes, and he went to his room, which is down stairs across a small hall from the dining room, and I went to my room, which is up stairs. This was on Saturday night before Mrs. Stewart left my house on the following. Thursday. After we left the dining room that night, I went to the door of my room, made an effort to open my door, and found that it was locked; then I made a second effort to open it, when Mrs. Stewart, who was inside my room, unlocked and opened the door, and remarked that she had been in my room reading. She then went to the room she was occupying, which is directly opposite mine, across a hall about eight feet wide. I went in my room, got the pitcher, and went down stairs to get some water for my little children; brought it in my room, put it on the stand table, pulled off my coat, preparing to retire, when Mrs. Stewart called to me from her room. I stepped to her door, and she remarked that she had a sore finger, caused from a burn, holding her hand out, and wanted to know of me what was good for it; to which I replied, 'Mutton suet is good for a burn.' Then she said, 'There is none here;' that she and Mrs. Selz, my wife, had looked for it and could not find it. She then went back in her room, and I went into my room and retired. This was all that was said and done between Mrs. Stewart and me that night. The next morning, which was Sunday morning, I went into the kitchen to make a fire in the stove, and Mrs. Stewart came in there, and I said, 'Good morning, Mrs. Stewart,' and she said, 'Mr. Selz, you insulted me last night.' I replied, 'I did not, Mrs. Stewart.' And she said, 'You did, and you have got to pay me $500 or I will make trouble in your family, and ruin your reputation.' I said, 'I did not insult you, and don't owe you $500; don't owe you anything.' She said, 'You have got it to pay. I'm a woman, and you are a man, and I have the advantage of you. They —.' I then told her that to keep down trouble with my family and friends, I would pay her $50. She studied awhile, and said, 'Double that, and I will take it.' I said, that before I would have trouble I would pay the $100, and she said all right. I told her that I did not have the money then, but would get it for her the next day. I got the money Monday and paid it to her myself. My wife paid her wages to her. When I paid Mrs. Stewart the $100 on that Monday evening, she counted it, and said, 'That's correct.' She left my house on the following Thursday. On Wednesday following this Monday her time was up, and my wife, after paying her wages, told her she could remain there at her house until she, Mrs. Stewart, could find another place to go to. At this time my wife did not know of my having paid Mrs. Stewart the $100, nor did she know anything about the affair. After she left my house I did not see her any more until I saw her with P. E. Williams, the defendant, at the gin in Pilot Point, on Saturday, the 27th day of October, 1894. My residence is about 100 yards from the gin. Mrs. W. J. Stewart and the defendant, P. E. Williams, drove up the road, which is forty or forty-five feet south from the office of the

gin. The office is not connected with the gin, there being a space of twenty-five or thirty feet between them. There is a platform between the office and gin. The gin is west of the office. The defendant and Mrs. W. J. Stewart came in a two-horse buggy, and they had a double-barrel shotgun in the buggy with them when they came up. When they came up I was in the office. Mrs. Stewart remained in the buggy out in the road, and the defendant, P. E. Williams, whom I had never seen before, came into the office, introduced himself to me, and said, 'Mrs. Stewart is out there in the buggy, and wants to see you.' I went out with Williams to the buggy, where Mrs. Stewart was, spoke to her, and asked her what she wanted, and she said, 'I want $400 more money.' I said, 'Mrs. Stewart, I don't owe you any money, and can't pay it.' When I told Mrs. Stewart that I did not owe her any money, and could not pay it, the defendant, P. E. Williams, who was standing by, reached in the buggy, got the gun, pulled it down on me, pointed it at me, and said, 'You insulted my mother-in-law, and you have got to pay it, and that God damn quick,' with the gun pointing at me. I said, 'I did not insult her, and don't owe her any money.' Then Williams, the defendant, said, 'You have got to pay that money, and that right now, or I will kill you,' with the muzzle of the gun pointing at me. I was scared, and thought that Williams meant what he said. I thought he intended to kill me if I did not pay the money. Then Williams drew the gun on me the second time, and said, 'God damn you, you have got it; pay it right now.' I told him I had no money, to which he replied, 'Your check is good, and you have got to pay it or give a check for it right now.' I told Williams that I would have to go to the office to write the check, and we started off towards the office, when I asked him to leave the shotgun there. He stopped, and said, 'You want to trap me.' I told him that I had no arms in the office. Then Mr. J. W. Phelps, who was standing not far off, remarked to Williams, 'I have known Mr. Selz a long time, and whatever he tells you is all right.' Then Williams said, 'I am fixed for you, anyway. I've got one here [putting his hand on the side of his breast], and one here' [placing his hand on his hip]. Williams and I went on then into the office of the cotton gin, I walking in front, and he not far behind me. I noticed the handle of his pistol up about his breast pocket. When we got into the office I was frightened—was scared. First became scared, for I thought he meant what he said when he told me he would kill me if I did not pay the money; and then after I got into the office I saw the handle of his pistol. He held his hand on the pistol while he was in the office. Williams was standing by me when I wrote the check. I delivered the check to P. E. Williams, the defendant. He got in the buggy with Mrs. W. J. Stewart, and they drove off together. After that, in about fifteen or twenty minutes, they both came back together in the same buggy. Williams came into the office where I was, and Mrs. Stewart remained out in the buggy by the gin lot gate. When Williams came into the office the second time he said, 'This

check is wrong, and I believe you made the mistake purposely. You have got to correct it, and correct it damn quick.' When he said this, he had his hand up about his breast, where I had seen the handle of the pistol before. He did not take the check out of his pocket; had the check in his left hand. I looked at the check he handed me, and saw that I had made a mistake in the figures; that instead of putting it $400, I wrote it in figures $4.00, placing the dot in the wrong place, while the written part was 'four hundred,' all right. I wrote a new check for $400, and delivered it to P. E. Williams, who took it, got in the buggy with Mrs. W. J Stewart, and they drove off together in the buggy. I gave that check to P. E. Williams because I had to. I was frightened, because he had his hand where I had seen the handle of a pistol before, and I was still afraid. If I had not been afraid of his killing me, I would not have given this check to him. I still thought he meant what he said when he threatened to kill me, and I was frightened and scared when Williams was in the office the second time. The check I gave Williams was paid by the Pilot Point National Bank, and was returned to me after payment, and I destroyed it. The bank returns the checks I give on the first of every month; and I compare my books with the bank's statement of my account, and if I find they correspond, I destroy all the checks. This check in question was returned to me in a bunch of other checks, and I destroyed the entire bunch without thinking about this particular one. This is my custom, and I rarely ever keep one of my old checks returned to me by the bank after payment. [Here check was handed witness.] Except the red writing on the face of the check, this is an exact copy of the one I gave P. E. Williams, and which was paid by the Pilot Point National Bank; and this check is written on the same form I used in writing the check delivered to P. E. Williams—the firm of Cooper, Selz & Co. Mr. A. H. Gee is president of that bank, Mr. McFarland is cashier, and Mr. J. P. Clifton is assistant cashier.'' [Here the check was introduced in evidence and read to the jury, except the red writing on the face. The check reads as follows: ''No. 233. Cooper, Selz & Co., Merchants and Public Gin, and Dealers in Bagging and Ties. Pilot Point, Texas, October 27, 1894. Pay to the order of W. J. Stewart $400 (four hundred dollars). To Pilot Point National Bank, Pilot Point, Texas. Cooper, Selz & Co.''] Continuing, he said: ''At the gin, on that Saturday evening, when P. E. Williams came into the office and told me that Mrs. Stewart wanted to see me, I went from the office through the gate of the gin lot fence, and went around the horses' heads to the south side of the buggy. Mrs. Stewart was sitting on that side of the buggy. The road runs east and west, and the horses' heads were facing west. I was on the south and left side of the buggy, and Williams was on the north and right side. When Williams drew the shotgun on me, he pointed it across the buggy at me. I had never seen Mrs. Stewart in my room before that Saturday night she claimed I insulted her. My wife had been nursing the sick child for about two weeks. I did not

consent to give the check to Williams. I executed it because I had to do it. All this occurred in Denton County, State of Texas."

*A. T. Lobdell* and *C. N. Greenlee*, for appellant.—Defendant excepted to the charge of the court upon robbery, which was as follows: "Robbery, as the offense is charged in the first and second counts of the indictment in this case, is defined as follows, viz: 'If any person, by assault or violence, or by putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property with the intent to appropriate the same to his own use, he shall be punished,' etc. The offense as charged in the third and fourth counts in said indictment is defined as follows, to wit: 'If any person, by threatening to do some illegal act injurious to the person of another, shall fraudulently induce the person so threatened to deliver to him any property with the intent to appropriate the same to his own use, he shall be punished,'" etc.

1. The court committed a fundamental error in said second section of his charge, in failing to prescribe the punishment, should the jury find the defendant guilty under either article 722 or 723, Penal Code.

2. The court erred in the aforesaid section of his charge in defining robbery as set forth in article 723, Penal Code.

We submit, that in order to support a conviction for the appropriation of the check as alleged in the indictment herein, it devolves upon the State to prove the nonconsent of all of the owners of said check, and the failure to establish the nonconsent of each one of said owners of said check makes the facts insufficient to support the conviction. Cohen v. The State, 20 Texas Crim. App., 227; Taylor v. The State, 23 Texas Crim. App., 639; Duren v. The State, 15 Texas Crim. App., 626; Lyons v. The State, 30 Texas Crim. App., 644; Floyd v. The State, 29 Texas Crim. App., 355; Govitt v. The State, 25 Texas Crim. App., 419; Bowling v. The State, 13 Texas Crim. App., 338; Taylor v. The State, 23 Texas Crim. App., 639.

3. The court erred in permitting the State to introduce, over the objection of defendant, the supposed copy of the original check alleged to have been taken by defendant from the possession of Henry Selz, as shown by bill of exceptions number 2.

The indictment does not show that said check was for value. Neither does it allege the same. This is a conviction based upon the third count in the indictment, which alleges the sole ownership to be in Selz, while the undisputed proof goes to show that it was partnership property, and that if it ever was the individual property of Henry Selz, it was not his individual property when taken, if taken at all. And if not his property, then how could it become so after he parted with possession of same? Selz, the party alleged to have been robbed, states, that he signed Cooper, Selz & Co.'s name to the check. The copy corroborates him. He was the only member of said firm sworn as a witness, and his testimony could only negative his consent.

It was nowhere shown that Cooper and Williams, members of said firm, ever transferred their interest in said check to Selz. Their consent to the taking was not negatived, and in the absence of their testimony the presumption would naturally be that they consented to the taking, and the jury should have been so charged.

The defendant excepted to the introduction in evidence of the supposed copy of the original check, alleged to have been taken from Henry Selz. We submit, that before said copy of the original check alleged to have been taken from Henry Selz could be introduced as evidence, it must appear therefrom that said copy was a true and exact copy of the original check, and also, that it was an exact copy of the check set out in the indictment, and that if a variance appear between said copy and the indictment then said check would be inadmissible.

We submit, there being no allegation in the indictment that the check alleged to have been taken was of or for value, that it was error for the court to permit the State to prove, over the objection of the defendant, that said check was valuable; and there being no allegation in said indictment that said check was ever cashed, we submit that it was error for the court to permit the State to prove, over the objection of defendant, that said check was ever cashed.

4. The court erred in permitting Eber Boner to testify, that on Monday after the alleged robbery he saw defendant have a pistol, as shown by bill of exceptions number 5. This was error, as it was not connected with and had nothing to do with the alleged robbery, and could only prejudice the defendant in the eyes of the jury, and could not throw any light or bearing upon the case.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was convicted of the offense of robbery, and sentenced to imprisonment in the penitentiary for five years, and from the judgment and sentence of the lower court he prosecutes this appeal.

The indictment in this case contains four counts. The defendant was convicted under the third count, which is as follows: "And the grand jurors aforesaid, upon their oaths aforesaid, further present in said court, that the said P. E. Williams, on the day and year aforesaid, in the county and State aforesaid, and anterior to the presentment of this indictment, did then and there unlawfully threaten to do an illegal act injurious to the person of Henry Selz, to wit, did then and there threaten to kill the said Henry Selz, in substance, to wit: That he and W. J. Stewart wanted four hundred dollars; that the said Selz had to pay it, or that he, the said Williams, would kill him, the said Selz; that he, the said Selz, had to pay it right then and there, or give a check for it. And the said Williams did then and there, by the means of said threat, fraudulently induce the said Henry Selz to deliver to

him, the said P. E. Williams, without the consent of the said Henry Selz, one draft or check to the tenor following· 'No. 233. Cooper, Selz & Co , Merchants and Public Gin, and Dealers in Bagging and Ties. Pilot Point, Texas, Oct. 27, 1894. Pay to the order of W J. Stewart $400 00 (four hundred dollars). To Pilot Point National Bank, Pilot Point, Texas. Cooper, Selz & Co.'—which said draft or check was then and there the property of the said Henry Selz, with the intent then and there to deprive the said Henry Selz of the same, and to appropriate the same to his, the said P. E. Williams', own use, against the peace and dignity of the State."

The appellant contends in this case, that if the proof shows that a robbery was committed, it was done by assault and by violence, and that there is a variance between said count and the evidence, and the defendant can not be convicted under this count of the indictment. It will be noted that this count does not charge a robbery by assault and by violence, but same is predicated on article 723 of the Criminal Code, which reads as follows: "If any person by threatening to do some illegal act, injurious to the person of another, shall fraudulently induce the person so threatened to deliver him any property, with intent to appropriate the same to his own use, he shall be punished," etc. The proof in this case, on the part of the State, shows not only the threat to do violence to the person of the prosecuting witness, Selz, but that defendant proceeded to execute said threat by assaulting said prosecutor with his gun; that is, the proof shows that the defendant did what is charged in the indictment, and more, and a conviction might have been sustained under preceding articles of the code. But it does not follow that, because he might have been so convicted, there is a variance between said count and the proof in this case, no more than would follow, if a person was indicted for an aggravated assault, and the proof should show that he had committed an assault with intent to murder, he could, under such charge of aggravated assault, be convicted of same.

The said count in the indictment charges that the check in question was the property of Henry Selz, and the defendant contends, that inasmuch as the check alleged to have been taken from the prosecutor, Selz, was signed, "Cooper, Selz & Co.," same was the property of said company, and that, inasmuch as said count charges the check to be the property of Henry Selz alone, this constitutes a variance. The evidence in this case shows, that while the firm name was signed to the check, yet the prosecutor, Henry Selz, one of the members of the firm, was the party assaulted, and that he was compelled to execute the check in question, and deliver same to the defendant. The firm was not present and had nothing to do with the execution of said check, but it was executed in this way in order to enable the defendant to get the money from the bank, as the prosecutor, Selz, had no separate funds at the bank. The property in this case was taken from Henry Selz alone, and, in his settlement with the firm, said

amount was charged to him. It was not a robbery, and taking from the firm, but from Henry Selz. So far as the robbery was concerned, the check and funds were his property, were in his possession, and he was compelled to surrender same to defendant; and, as in a theft case, said check, being in his possession, was his property. Nor was it necessary, under the circumstances of this case, to negative the consent of any of the other firm members to the taking.

The State in this case introduced what purported to be a copy of the check, the draft alleged to have been taken from the prosecutor, Selz. This was after the loss and destruction of the original check had been shown, and it was permissible for the State to use this copy, which was written upon a blank similar to the original check, in connection with parol proof, as a part of the proof of the contents of the destroyed original, and in this action of the court we see no error; and the fact that said copy had some writing across the face of same, which was not on the original instrument as set out, as explained by the witness, constituted no variance.

The appellant asked the court to charge the jury, that, in order to convict the defendant, the State, for such conviction, must rely solely upon the threat to kill, as incorporated in the indictment, and that a conviction can not be had upon any threats of any other nature or character. This charge was substantially given by the court, and it was no error to refuse the requested instructions.

It was not necessary in this indictment to allege that the check in question had any specific value. It was described as a check or draft, and was set out in the indictment according to its tenor, and it was such property as is the subject of theft or robbery. See article 732, Penal Code. The allegations in the indictment show that the defendant demanded of the prosecutor $400, or a check for same, and that the check in question was given; and there was no error in permitting the proof that the defendant cashed said check, and procured the money thereon. It was a part and parcel of the transaction, and was admissible in evidence.

There was no error in this case in permitting the State to show, that on Monday following the robbery the defendant had a pistol. The State showed originally by Henry Selz that, as a part of the transaction constituting the robbery, when the defendant came back the second time to get him to correct the draft, defendant started to carry his gun to the office, but, on request of the prosecutor, he left it at the buggy, putting his hand in his bosom, and remarking that he was fixed for him, anyhow; and after he went into the office, the prosecutor testified that he saw the handle of a pistol; that the defendant had his hand on or about it while he was signing the draft. The defendant himself took the stand, and denied that he had any pistol on the occasion, and further testified, that he had never owned or carried a pistol in the State of Texas; and, in rebuttal of this evidence by the defendant, it was competent for the State to show, that on the Monday

following the robbery defendant was seen by the witness Boner carrying a pistol on his person.

The appellant contends in this case, that the prosecutor had previously agreed to pay Mrs. Stewart, his mother-in-law, $400, in consideration for an insult that she alleged had been offered her by said prosecutor, and that he went with Mrs. Stewart on the occasion merely for the purpose of collecting this money, which had been agreed to be paid Mrs. Stewart, and that this constituted no offense. Upon this question there were two theories presented—one by the State, and one by the defendant. The defense showed that on Saturday night, about a week before the alleged offense, at the house of the prosecutor, where Mrs. Stewart was employed, the prosecutor made indecent proposals to her, and that she then threatened to expose him, and to prosecute him before the law, and to tell his wife, and that, in consideration that she would not do so, the prosecutor had agreed to pay her $500; that within the next day or two he paid her $100 of said sum, and agreed to pay her the balance; that he did not do so; and that she got her son-in-law, and went to the gin where he was at work, for the purpose of collecting said amount. On the other hand, the State showed by testimony that the prosecutor made no indecent proposals to Mrs. Stewart, but that she accused him of same, and threatened him with exposure unless he would pay her $500; that he first offered her $50, as he did not care to have any trouble with her; and that then she agreed to take $100; and that he paid her this amount, and had made no agreement whatever with her to pay her any further sum. Both of these theories were presented to the jury by the charge of the court, and the charge on behalf of the defendant was liberal, in that the instruction told the jury, if defendant believed that the prosecutor owed said money to Mrs. Stewart, and that he took that means to collect same, they would acquit him, although in fact the prosecutor had made no agreement to pay her the same. The jury, however, do not appear to have taken this view of the case, but took the view as presented by the evidence offered on the part of the State; and they were justified, in our opinion, in doing so.

There being no errors of record requiring the reversal of this case, the judgment and sentence of the lower court are affirmed.

*Affirmed.*

DAVIDSON, Judge, absent.